IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
|     Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. 08-CR-30266-MJR |
| | ) | |
| JAMES C. NELSON, | ) | |
|     Defendant | ) | |

**SENTENCING MEMORANDUM REGARDING CRACK COCAINE AND POWDER COCAINE OFFENSES**

REAGAN, District Judge:

    I.    The History and Underlying Assumptions of the
          Sentencing Disparity for Crack and Powder Cocaine Offenses

As is discussed more fully below, the sentencing disparity at issue here originated in a 1986 statute, which the United States Supreme Court confronted two decades later in ***Kimbrough v. United States*, 552 U.S. 85, 128 S. Ct. 558 (2007).** Kimbrough dramatically altered the way in which federal district courts sentence defendants for "crack" cocaine and powder cocaine offenses. Justice Ginsburg's opinion thoroughly delineates the history of the crack/powder disparity. A summary of that history furnishes the starting point for this Court's analysis.

Crack cocaine and powder cocaine are two forms of the same drug. Powder cocaine (cocaine hydrochloride) most often is inhaled through the nose. It also can be mixed with water and injected. ***Kimbrough*, 128 S. Ct. at 566,** *citing* **United States**

**Sentencing Commission, Special Report to Congress: Cocaine and Federal Sentencing Policy at 5, 12 (Feb. 1995)("1995 Report").** Crack cocaine (one form of cocaine base) generally is sold and used in single-dose rocks, which are smoked. *Id*. Despite being chemically similar, crack and powder cocaine have been treated quite differently for sentencing purposes. *Id., citing* **United States Sentencing Commission**, **Report to Congress: Cocaine and Federal Sentencing Policy iv (May 2002)("2002 Report").**

The disparity in sentences for crack offenses and powder cocaine offenses traces back to the Anti-Drug Abuse Act of 1986, 100 Stat. 3207 ("1986 Act"). That Act created a two-tiered system of mandatory minimum sentences for drug manufacturing and distribution crimes. The 1986 Act used the weight of the drugs to distinguish between "major" dealers and "serious" dealers. Ten-year minimum terms applied to "major" dealers, and five-year minimum terms applied to "serious" dealers.

In the mid-1980s, crack (an inexpensive and relatively new drug) had become a hot topic and a matter of increasing public concern. Congress believed that crack cocaine was more dangerous to users than powder cocaine, that crack cocaine was extremely addictive (more so than powder cocaine), and that crack users and dealers were more likely to be violent than users and dealers of other drugs.

Based on these assumptions, the 1986 Act adopted a 100-to-1 ratio that treated every gram of crack cocaine as the equivalent of 100 grams of powder cocaine. The 1986 Act imposed:

- a 5-year mandatory minimum sentence for any

> defendant accountable for 5 grams of crack cocaine OR 500 grams of powder cocaine; and
>
> o    a 10-year mandatory minimum sentence for any defendant accountable for 50 grams of crack cocaine OR 5,000 grams of powder cocaine.[1]

In the Sentencing Reform Act of 1984, **18 U.S.C. § 3551, *et seq*.**, Congress gave the United States Sentencing Commission the task of promulgating sentencing guidelines. The United States Sentencing Guidelines took effect in November 1987. The Sentencing Commission formulated the Guidelines using an empirical approach based on data about past sentencing practices. ***Kimbrough,* 128 S. Ct. at 567.** But the Commission did *not* use this empirical approach to develop the guideline sentences for drug-trafficking offenses, instead opting for the weight-based scheme of the 1986 Act. Specifically as to sentences for crack cocaine and powder cocaine, the Commission used a 100-to-1 ratio. *Id., citing* **1995 Report at 1.**

As the years passed and additional research was conducted, the Sentencing Commission concluded that the 100-to-1 ratio was not warranted and in fact failed to meet the sentencing objectives of the Sentencing Reform Act and the 1986 Act. ***Kimbrough* at 568,** *quoting* **2002 Report at 91.** In Kimbrough, the Supreme Court summarized the three key problems with the crack/powder disparity identified by the Sentencing Commission in its series of reports (including the two reports cited above and

---

[1]    **21 U.S.C. 841(b)(1),** *cited in Kimbrough,* **128 S. Ct. at 567.**

the United States Sentencing Commission, Report to Congress: Cocaine and Federal Sentencing Policy 8 (May 2007)("2007 Report").

First, the Commission acknowledged that the 100-to-1 ratio was premised on outdated and unfounded assumptions about the relative harmfulness of the two drugs and the relative prevalence of harmful conduct associated with the drugs. For instance, the Commission found that (a) crack is associated with far less drug-trafficking violence than previously assumed, and (b) the widespread epidemic of crack cocaine use by young Americans had not occurred.

Second, the Commission found the disparity inconsistent with the goal of punishing major traffickers more severely than low-level dealers. In fact, the 100-to-1 ratio led to the anomalous result that "retail crack dealers get longer sentences than the wholesale drug distributors who supply them the powder cocaine from which their crack is produced." ***Kimbrough,* 128 S. Ct. at 568.**

Third, the Commission declared that the sentencing disparity fostered lack of confidence in the criminal justice system due to a widely-held perception that it "promotes unwarranted disparity based on race." *Id*. In ***Kimbrough,* 128 S. Ct. at 568,** the Court remarked that roughly 85% of defendants convicted of crack offenses in federal court are African-American, so the severe sentences resulting from the 100-to-1 ratio fall primarily on African-American offenders.

The Commission did not advocate identical treatment for crack and powder cocaine but found that the 100-to-1 ratio significantly overstated the differences

between the two forms of cocaine and should be substantially reduced. Without waiting for Congress to take action, the Sentencing Commission amended the Sentencing Guidelines in 2007 as a "partial remedy" to the problem resulting from this disparity. That Amendment, effective November 1, 2007, reduced the base offense level associated with each quantity of crack by two levels. *Kimbrough,* **128 S. Ct. at 569.** After the 2007 Amendment, the Guidelines advanced a crack/powder ratio varying (at different offense levels) between 25 to 1 and 80 to 1. *Id*. **at 571,** *citing* **Sentencing Guidelines for United States Courts, 72 Fed. Reg. 28571-28572 (2007).**

In Kimbrough, the Court emphasized that the crack cocaine Guidelines did not exemplify the Commission's "exercise of its characteristic institutional role," because in formulating the Guideline ranges for crack offenses, the Commission did not properly consider "empirical data and national experience." *Kimbrough,* **128 S. Ct. at 575.** Therefore, the Supreme Court held that a district court, in sentencing a particular defendant, could properly conclude that the crack/powder disparity yields a sentence greater than necessary to achieve § 3553(a)'s purposes. *Id*. This holding gave district courts the freedom to deviate from the Sentencing Guidelines based on the sentencing judge's disagreement with the 100-to-1 ratio.

    II.    <u>This Court's Authority to Reject the 100-to-1 Ratio</u>

As explained above, prior to Kimbrough, sentencing judges could not impose a sentence based on their disagreement with the crack/powder cocaine disparity. Commenting on pre-Kimbrough precedent in the Seventh Circuit, Judge Posner pointed

out that a district judge could "rail against the 100:1 ratio, but that would have been spitting against the wind, since we had held that the ratio was not to be questioned by sentencing judges." *United States v. Taylor*, 520 F.3d 746, 747 (7th Cir. 2008).

In *United States v. Booker*, 543 U.S. 220, 244-45 (2005), the Supreme Court instructed district courts to treat the Sentencing Guidelines as "effectively advisory." So the once-mandatory Guidelines became one factor among several factors that courts must consider in determining the appropriate sentence for a given case.[2]

Then came Kimbrough, authorizing a district court to sentence a crack cocaine offender to a term below the range delineated in the Guidelines, if the court believes that the disparity between the guideline sentence for a given amount of crack cocaine and the sentence for an equivalent amount of powder cocaine (the 100-to-1 disparity) leads to a sentence that fails to accomplish the purposes of sentencing set forth in 18 U.S.C. § 3553(a). *United States v. Bruce*, 550 F.3d 668, 674 (7th Cir. 2008), *citing Kimbrough*, 128 S. Ct. at 565. *Accord United States v. Padilla*, 520 F.3d 766, 773 (7th Cir. 2008)(After Kimbrough, "district courts are free to consider, as part of

---

[2] As modified by *Booker*, the sentencing statute (18 U.S.C. § 3553(a)) directs courts to "impose a sentence sufficient, but not greater than necessary" to accomplish the goals of sentencing, including reflecting the seriousness of the offense, promoting respect for the law, providing just punishment for the offense, affording adequate deterrence to criminal conduct, and protecting the public from further crimes by the defendant. **18 U.S.C. § 3553(a)**, *quoted in Kimbrough*, 128 S. Ct. at 570.

**their analysis of the § 3553(a) factors, the disparity in the guidelines ranges for offenses involving crack cocaine compared to those involving powder cocaine").**

Put simply, Kimbrough rejected the view that sentencing courts were obligated to apply the 100-to-1 ratio to crack offenses. *See United States v. Bush,* **523 F.3d 727 (7th Cir. 2008).** The Supreme Court also reaffirmed that the district court must calculate and consult the advisory guideline range and then address the relevant § 3553(a) factors. *Kimbrough,* **128 S. Ct. at 575.**

As the Supreme Court stated this year in *Spears v. United States,* **129 S. Ct. 840, 843 (2009):**

> Kimbrough thus holds that with respect to the crack cocaine Guidelines, a categorical disagreement with and variance from the Guidelines is *not* suspect.
>
> That was indeed the point of Kimbrough: a recognition of district courts' authority to vary from the crack cocaine Guidelines based on policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case. The latter proposition was already established pre-Kimbrough, see United States v. Booker, 543 U.S. 220, 245... (2005).
> ... That the Government did not prevail in Kimbrough proves that its concession – "that a district court may vary from the 100:1 ratio if it does so 'based on the individualized circumstance[s]' of a particular case," – understated the extent of district courts' sentencing discretion.

So, post-Kimbrough, "district courts are allowed to impose lesser sentences after a determination that the 100-to-1 ratio produces a sentence greater than necessary for a particular defendant." *U.S. v. Brazelton,* **557 F.3d 750 (7th Cir. 2009).** The court

Page 7 of 17

is not compelled to use a ratio other than the 100-to-1 ratio built into the Guidelines but is free to do so.

Like Guideline ranges for other offenses, the Guideline range for crack cocaine sentences is not dictated by statute. It is advisory only, leaving the undersigned Judge free to depart from the 100-to-1 ratio. ***United States v. Clanton*, 538 F.3d 652, 658-59 (7th Cir. 2008),** *cert denied,* **129 S. Ct. 2380 (2009).** Of course, the sentencing court must adequately explain its reasons for imposing a particular sentence, and if the sentence is outside the Guidelines range, "provide a justification that explains and supports the magnitude of the variance." ***United States v. Scott*, 555 F.3d 605, 608 (7th Cir. 2009),** *quoting Gall v. United States,* **555 U.S. 38, 128 S. Ct. 586, 595 (2007).**

### III.  The Position of the Current Administration

As referenced above, the United States Sentencing Commission has attempted several times to reduce the crack/powder sentencing disparity. Congress, too, has wrestled with how to best address growing concerns over this disparity.

The Commission proposed a 1995 amendment to the Guidelines that would have replaced the 100-to-1 ratio with a 1-to-1 ratio. Congress rejected that amendment but directed the Commission to propose a revision. The Commission submitted the 1995 and 2002 Reports, both of which recommended changing the 100-to-1 ratio. Various bills were introduced and statements made on the floor of the House and Senate, but the Commission's recommendations were not implemented. For instance, in December 2001,

Senators Orrin Hatch and Jeff Sessions introduced the Drug Sentencing and Reform Act of 2001 (2002 S. 1874), which would have reduced the powder/crack cocaine ratio from 100-to-1 to 20-to-1. **2002 Report at 4.** Ultimately, via the November 2007 Amendments, the Commission supplied a "partial remedy" to the problems generated by the disparity. *Kimbrough,* **128 S. Ct. at 561.** But more remains to be done.

The Obama Administration has weighed in on the issue, loud and strong. In April 2009, Assistant Attorney General Lanny A. Breuer publicly stated in a hearing before the Senate Judiciary Committee's Subcommittee on Crimes and Drugs:

> ... we cannot ignore the mounting evidence that the current cocaine sentencing disparity is difficult to justify based on the facts and science, including evidence that crack is not an inherently more addictive substance than powder cocaine. We know of no other controlled substance where the penalty structure differs to dramatically because of the drug's form.
>
> Moreover, the Sentencing Commission has documented that the quantity-based cocaine sentencing scheme often punishes low-level crack offenders far more harshly than similarly situated powder cocaine offenders.... The impact of these laws has fueled the belief across the country that federal cocaine laws are unjust.

**Breuer Statement at Hearing on "Restoring Fairness to Federal Sentencing: Addressing the Crack-Powder Disparity" Held Before the Subcommittee on Crimes and Drugs of the United States Senate Judiciary Committee, pp. 8-9 (April 29, 2009).**

Breuer then announced that because the "current federal cocaine sentencing structure fails to appropriately reflect the differences and similarities between crack and powder cocaine, ... the Administration believes Congress's goal

should be to **completely eliminate** the sentencing disparity between crack cocaine and powder cocaine." *Id*., at p. 10 (emphasis added).

Two weeks later, United States Attorney General Eric Holder appeared before the Judiciary Committee of the House of Representatives. In a presentation highlighting the priorities of the United States Department of Justice, Holder advised that he had directed the Deputy Attorney General to convene a Sentencing and Corrections Policy Working Group to examine, inter alia, federal cocaine sentencing policy. He further stated that, based on that review, the Department would determine what sentencing reforms are needed, specifically including recommendations to Congress to change the crack and powder cocaine sentencing policy. *See* **Statement of Eric H. Holder Jr., Attorney General of the United States, before the United States House of Representatives Committee on the Judiciary (May 14, 2009) (http:www.usdoj.gov/ag/testimony/2009/ag-testimony-090514.html).**

In June 19, 2009 remarks to the Judicial Conference of the United States Court of Appeals for the D.C. Circuit, Attorney General Holder removed all question as to the Administration's stance:

> It is the position of this Administration that the 100-to-1 crack powder sentencing ratio is simply wrong. It is plainly unjust to hand down wildly disparate prison sentences for materially similar crimes. It is unjust to have a sentencing disparity that disproportionately and illogically affects some racial groups.

**Remarks of Attorney General Eric Holder at D.C. Court of Appeals Judicial Conference**

**(June 19, 2009)(www.usdoj.gov/ag/speeches/2009/ag-speech-090619.html).**

Holder echoed this position in a June 24, 2009 speech at the Congressional Black Caucus' symposium on "Rethinking Federal Sentencing Policy – 25th Anniversary of the Sentencing Reform Act."

> The U.S. Sentencing Commission has begun a review of the impact of Booker and of the federal sentencing system as a whole by soliciting testimony at regional hearings. Those hearings will identify those practices that contribute to the goals of the Sentencing Reform Act, and those practices that do not. ...
>
> Public trust and confidence are also essential elements of an effective criminal justice system.  Our laws and their enforcement must not only be fair, they also must be perceived as fair.  A perception of unfairness undermines governmental authority in the criminal justice process.  It leads victims and witnesses of crime to think twice before cooperating with law enforcement, tempts jurors to ignore the law and facts when deciding a criminal case, and causes the public to question the motives of government officials. Accordingly, we must create a system where the factual basis for sentencing in a particular case is clear to all parties and to the public, and where the sentences themselves are truly commensurate with the crime committed.
>
> One thing is very clear to me: we must review our federal cocaine sentencing policy.  Fifteen years ago, the United States Sentencing Commission first reported on the differences in sentencing between crack and powder cocaine. Since then, the need to reassess the federal cocaine sentencing laws has only grown stronger.
>
> **This Administration firmly believes that the disparity in crack and powder cocaine sentences is unwarranted, creates a perception of unfairness, and must be eliminated.**  This change should be addressed in Congress....

> There is no tension between a sentencing scheme that is effective and fair and one that is tough and equitable. We must work toward these twin goals and we must do so now. Too much time has passed, too many people have been treated in a disparate manner, and too many of our citizens have come to have doubts about our criminal justice system.

**Remarks of Attorney General Holder at Charles Hamilton Houston Institute for Race and Justice Congressional Black Caucus Symposium (June 24, 2009) http://www.usdoj.gov/ag/speeches/2009/ag-speech-0906242.html)(emph. added).**

Likewise in July 22, 2009 remarks to the National Black Prosecutors Association in Memphis, Tennessee, Attorney General Holder stressed:

> We will follow the facts and the law, wherever they may lead us. We are taking this same approach in our review of federal sentencing laws.... As prosecutors, we need to do what is right, no matter what challenges confront us.
>
> The 100-to-1 crack-powder sentencing ratio is a perfect example. Although some may seek to impose the "soft-on-crime" label on anyone who speaks the truth about this issue, we all know that this egregious difference in punishment is simply wrong.
>
> I have seen first-hand the effect that disparities in drug sentences have had on our communities. In my career as a prosecutor and as a judge, I saw too often the cost borne by the community when promising, capable young people sacrificed years of their futures for non-violent offenses.
>
> Let me be clear: the Department of Justice will never back down from its duty to protect our citizens and our neighborhoods from drugs, or from the violence that all-too-often accompanies the drug trade. But we must discharge this duty in a way that protects our communities as well as the public's confidence in the justice system.

**Remarks by Attorney General Eric Holder at the National Black Prosecutors Association's Profiles in Courage Luncheon (July 22, 2009) (http://www.usdoj.gov/ag/speeches/2009/ag-speech-0907221.html).**

This Court, too, has seen evidence that the cocaine sentencing disparity has generated mistrust in the legal process and justice system in this District. The Court firmly believes that sentences must be fair to both victims and defendants. The system should protect the public, deter crime *and* instill faith that sentences are meted out equitably. Eliminating the 100-to-1 ratio is one step in achieving that goal.

This Judge now is free "to reject a guideline as inconsistent with his own penal theories." *United States v. Aguilar-Huerta*, **576 F.3d 365, 367 (7th Cir. 2009).** As the Supreme Court pointed out in *Spears*, **129 S. Ct. at 843:** "with respect to the crack cocaine Guidelines, a categorical disagreement with and variance from the Guidelines is not suspect." Quoting with approval the dissenting opinion of the Eighth Circuit, the Supreme Court signaled that a district judge who disagrees with the policy underlying the Guidelines can adopt his own *categorical* crack/powder ratio in place of the 100-to-1 ratio set forth in the Guidelines. *Spears,* **129 S. Ct. at 844.**

    IV.    This Court's Conclusion as to the Ratio in U.S.S.G. § 2D1.1

This Court rejects the 100-to-1 ratio on policy grounds. This Court fundamentally disagrees with the policy underlying the crack cocaine Guidelines. The 100-to-1 ratio is excessive and insupportable. First and foremost, as the Supreme Court found in Kimbrough, that ratio was not based on sound empirical data and does not

"exemplify the Commission's exercise of its characteristic institutional role." *Kimbrough,* 128 S. Ct. at 563.

Second, this Court concludes, as have other District Courts and the Sentencing Commission, that the assumptions about the relative dangers posed by crack and powder cocaine have proven largely incorrect. *See, e.g., United States v. Gully,* 619 F. Supp. 2d 633, 642 (N.D. Iowa, 2009); *United States v. Russell,* – F. Supp. 2d –, 2009 WL 2485734 (W.D. Pa. Aug. 12, 2009); *United States v. Owens,* 2009 WL 2485842 (W.D. Pa. Aug. 12, 2009); 2007 Report at 100 (the ratio Congress embedded in the sentencing statute far overstates both the relative harmfulness of crack cocaine and the serious nature of most crack cocaine offenses).

One initial belief was that crack cocaine was so much more addictive than powder cocaine, it would result in a lost generation of "crack babies." That dire prediction has not come true. Nor do the data support the early assumption that crack cocaine is associated with more *violent* crimes than powder cocaine. *See Kimbrough*, 128 S. Ct. at 568; 2002 Report at 96-100 ("the negative effects of prenatal crack cocaine exposure are identical to the negative effects of prenatal powder cocaine exposure," and "the epidemic of crack cocaine use by youth never materialized to the extent feared."); 2002 Report at 100 ("More recent data indicate that significantly less trafficking-related violence or systemic violence ... is associated with crack cocaine trafficking offenses than previously assumed."); 2007 Report at 36 ("the prevalence of violence decreased [between 2002 and 2005] ... continuing

a trend identified in the 2002 Commission Report, [and] continues to occur only in a minority of offenses.").

Third, the 100-to-1 ratio does not promote the goals of the 1986 Act. Research and experience show that it tends to punish low-level crack dealers more harshly than major traffickers of powder cocaine, since imported powder cocaine is converted into crack at a low level in the distribution hierarchy. *See Kimbrough*, 128 S. Ct. at 568; *United States v. Lewis*, 623 F. Supp. 2d 42, 46 (D. D.C. 2009).

Fourth, the 100-to-1 ratio fails to base punishment on relevant factors such as the use of weapons or injury to others in a particular case, instead painting with a broad brush by *assuming* that *all* crack offenses involve weapons or bodily injury. Like the Judges in *Gully* and *Owens*, this Court finds that the 100-to-1 ratio is a "remarkably blunt instrument" for punishing crack cocaine offenders. The more reasoned and fair method is to enhance the sentence of a particular defendant if his offense actually *involved* a weapon, violence, or harm to others, etc.

Fifth, the 100-to-1 ratio's disproportionate impact on African-American offenders has eroded confidence in our entire criminal justice system. This proposition can be neither doubted nor ignored. *See Kimbrough*, 128 S. Ct. at 558; *Gully*, 619 F. Supp. 2d at 641. The 2002 Report noted that 85 percent of defendants convicted of crack offenses in federal court were African-American. **2002 Report at 102-103.** The data reflected in the Commission's 2007 Report confirmed this disproportionate impact – 81.8 percent of crack cocaine offenders in 2006 were African-American, as compared

to less than 9 percent white offenders. **2002 Report, Table 2-1.** Indeed, in a detailed study on fifteen years of federal sentencing, the Sentencing Commission singled out the crack/powder disparity as a category with an adverse racial impact. **See also United States Sentencing Commission,** *Fifteen Years of Guidelines Sentencing* **at 132 (2004) (www.ussc.gov/15_year).**

As discussed above, the major assumptions underpinning the 100-to-1 ratio either were unwarranted or have been disproved. When the 1986 Act was being enacted, Senator Lawton Chiles urged his colleagues to pass the legislation at hand (decreasing the amount of cocaine base needed to trigger the stiffest penalties), imploring them: "Such treatment is absolutely essential because of the especially lethal characteristics of this form of cocaine." **2002 Report at 8.**[3]

Twenty years later, the Director of the National Institute on Drug Abuse (a division of the Department of Health and Human Services) debunked the myth that crack is a uniquely addictive drug, testifying that the "pharmacological effects of cocaine are

---

[3] Senator Chiles' testimony conjured an alarming vision of crack cocaine use: "Once people are hooked, all they can think about is staying high, that euphoria which they get, but there is a corresponding down that is just as deep in its trough as the high is at the crest of the wave. And so we find that people when they are addicted, will go out and steal, rob, lie, cheat, take money from any savings, take refrigerators out of their houses, anything they can get their hands on to maintain that habit.... [and] local police and sheriffs have found themselves unable to cope with the crime." **2002 Report at 9-10,** *citing* **Chiles testimony from 132 CONG. REC. 31, 329-30 (Oct. 15, 1986).**

the same, regardless of whether it is in the form of cocaine hydrochloride [powder] or crack cocaine." **Testimony of Dr. Nora Volkow from 2006 Public Hearing,** *quoted in* **amici curiae brief filed on certiorari petition in** *Kimbrough*, **2007 WL 2155555, \*13-14 (2007).**

The flawed assumptions underlying the disparate treatment of crack and powder cocaine offenses cannot stand in light of the evidence and experience amassed since the ratio was introduced.

Therefore, this Court rejects the 100-to-1 ratio in U.S.S.G. § 2D1.1 on policy grounds.  The Court concludes that the appropriate methodology is to use a 1-to-1 crack-to-powder ratio and then consider any aggravating factors under 18 U.S.C. § 3553(a), for instance, enhancing the sentence, if appropriate and necessary, for a particular defendant whose offense involved bodily injury or weapons, who had a history of violence, who obstructed justice, whose criminal history is under represented by the Guidelines or for other conduct justifying enhancement.  Similarly, the Court will consider reducing the sentence based upon mitigating factors under 18 U.S.C. § 3553(a), such as exemplary military service and extraordinary "good works" or public service.

DATED July 21, 2010.

s/ Michael J. Reagan
MICHAEL J. REAGAN
**United States District Judge**
